# 25-1424

# United States Court of Appeals for the Second Circuit

STATE OF NEW YORK, et al.,

*Plaintiffs-Appellees,*

v.

UNITED STATES DEPARTMENT OF EDUCATION, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Southern District of New York

## MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR A STAY PENDING APPEAL

BARBARA D. UNDERWOOD
  *Solicitor General*
JUDITH N. VALE
  *Deputy Solicitor General*
STEPHEN J. YANNI
  *Assistant Solicitor General*
    *of Counsel*

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Plaintiffs-Appellees
28 Liberty Street
New York, New York 10005
(212) 416-6184

(*Counsel listing continues on signature pages.*)          Dated: June 12, 2025

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ii

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND ....................................................................................... 4

ARGUMENT .......................................................................................... 12

    THIS COURT SHOULD DENY A STAY PENDING APPEAL .......................... 12

    A.    Plaintiffs, Not Defendants, Are Exceedingly
        Likely to Succeed on the Merits. ............................................ 12

        1.    The district court has jurisdiction. .................................... 12

        2.    The May 11 rescission letter constitutes
              final agency action. ........................................................... 18

        3.    Defendants' rescission of the previously approved
              extensions was arbitrary and capricious. ....................... 19

            a.    Defendants failed to provide a reasoned
                explanation for their change in position. ................. 20

            b.    Defendants failed to consider plaintiffs'
                reliance interests. ..................................................... 23

        4.    Defendants' rescission of the previously
              approved extensions was contrary to law. ...................... 24

    B.    The Balance of Equities Weighs Dispositively
        in Plaintiffs' Favor. ................................................................ 25

CONCLUSION ...................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*Aetna Cas. & Sur. Co. v. United States,*
    71 F.3d 475 (2d Cir. 1995) .................................................. 13

*Bennett v. Spear,*
    520 U.S. 154 (1997) .................................................. 18-19

*Boaz Hous. Auth. v. United States,*
    994 F.3d 1359 (Fed. Cir. 2021) ........................................ 16

*Bowen v. Massachusetts,*
    487 U.S. 879 (1988) .................................................. 14-15

*City of Arlington v. FCC,*
    569 U.S. 290 (2013) .................................................. 21

*Columbus Reg'l Hosp. v. United States,*
    990 F.3d 1330 (Fed. Cir. 2021) ........................................ 16

*Community Legal Servs. in E. Palo Alto v. U.S. Dep't of Health*
    *& Hum. Servs.,*
    No. 25-2808, 2025 WL 1393876 (9th Cir. May 14, 2025) ............ 16, 27

*Department of Educ. v. California,*
    145 S. Ct. 966 (2025) .................................................. 18

*FDA v. Wages & White Lion Invs., L.L.C.,*
    145 S. Ct. 898 (2025) .................................................. 19-20

*In re World Trade Ctr. Disaster Site Litig.,*
    503 F.3d 167 (2d Cir. 2007) ........................................... 12

*League of Women Voters of U.S. v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) ........................................... 26

*Linea Area Nacional de Chile S.A. v. Meissner,*
    65 F.3d 1034 (2d Cir. 1995) ........................................... 14

ii

**Cases**                                                                                    **Page(s)**

*Maine Cmty. Health Options v. United States*,
    590 U.S. 296 (2020)...................................................................13, 15-16

*Polanco v. U.S. Drug Enf't Admin.*,
    158 F.3d 647 (2d Cir. 1998) ......................................................13, 15

*San Juan City Coll. v. United States*,
    391 F.3d 1357 (Fed. Cir. 2004) ...........................................................16

*Sustainability Inst. v. Trump*,
    No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025) ...................17

*U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*,
    592 U.S. 261 (2021)...............................................................................19

**Statutes**

American Rescue Plan Act of 2021, Pub. L. No. 117-2
    § 2001 ...................................................................................4-5, 20, 27
    § 9402 .........................................................................................................24
    § 9811 .........................................................................................................24

Fiscal Responsibility Act of 2023, Pub. L. No. 118-5..............................24

5 U.S.C.
    § 702 ..........................................................................................................12
    § 704 ..........................................................................................................18

20 U.S.C. § 1225 .............................................................................................5

28 U.S.C. § 1491 .......................................................................................12-13

**Regulations**

2 C.F.R. § 200.344 .................................................................5-6, 16, 22

FEMA, Major Disaster Declarations and Related Determinations:
    Expiration of COVID–19-Related Measures, 88 Fed. Reg.
    8884 (Feb. 10, 2023)...............................................................................6

iii

**Miscellaneous Authorities**                                     **Page(s)**

Letter from Adam Schott, U.S. Dep't of Educ., to Grantees (Jan.
    9, 2024), https://www.ed.gov/sites/ed/files/2024/01/ARP-
    Liquidation-Extension-Letter-1.9.24-final-for-signature-
    v3.pdf ................................................................................ 6

Letter from Miguel A. Cardona, U.S. Sec'y of Educ., to Betty
    Rosa, N.Y. State Comm'r of Educ. 1 (Aug. 5, 2021),
    https://www.nysed.gov/sites/default/files/programs/federal-
    education-covid-response-funding/nysed-arp-esser-plan-
    usde-approval-letter.pdf ..................................................... 5

N.Y. State Educ. Dep't, *American Rescue Plan (ARP):*
    *Elementary and Secondary School Emergency Relief*
    *(ESSER) State Plan* (June 7, 2021),
    https://www.nysed.gov/sites/default/files/programs/federal-
    education-covid-response-funding/nysed-arp-esser-plan.pdf .............. 5

S. Rep. No. 118-84 (2023) ................................................. 6, 20

U.S. Dep't of Educ., *Frequently Asked Questions: Elementary*
    *and Secondary School Emergency Relief Programs* (Dec. 7,
    2022 update),
    https://www.ed.gov/sites/ed/files/2022/12/ESSER-and-GEER-
    Use-of-Funds-FAQs-December-7-2022-Update-1.pdf ......................... 4

## PRELIMINARY STATEMENT

Beginning in 2021, the U.S. Department of Education awarded plaintiffs-appellees[1] billions of dollars in congressionally appropriated funds to respond to the profound, lingering impacts of the COVID-19 pandemic on K–12 education. The governing regulations allowed plaintiffs to seek reimbursement for eligible projects during a set liquidation period. In 2024 and early 2025, the Department exercised its regulatory authority to grant plaintiffs' requests to extend their liquidation periods through March 2026. In reliance on those extensions, plaintiffs implemented educational programming, infrastructure projects, and hiring plans, for which they could submit reimbursement requests throughout the extended liquidation periods.

On March 28, 2025, the Department abruptly rescinded its prior regulatory approvals of plaintiffs' extensions and terminated their liquidation periods effective immediately—reasoning that the extensions were unnecessary because the pandemic had ended. As a result, plaintiffs

---

[1] Plaintiffs-appellees are the States of New York, Arizona, California, Delaware, Hawaiʻi, Illinois, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, and Oregon; People of the State of Michigan; District of Columbia; and Pennsylvania Governor Josh Shapiro.

could no longer submit timely reimbursement requests to access over one billion dollars in unliquidated funds.

Plaintiffs brought this action in the U.S. District Court for the Southern District of New York against the Department and Secretary Linda McMahon challenging the rescission under the Administrative Procedure Act (APA), 5 U.S.C. § 706. Five days after the district court (Ramos, J.) preliminarily enjoined defendants from implementing the March 28 rescission, the Department issued a second letter on May 11 again terminating the liquidation periods. The court preliminarily enjoined this second rescission. Defendants appealed the second preliminary injunction and moved for a stay pending appeal. The motion should be denied.

*First*, plaintiffs are exceedingly likely to succeed on the merits. The district court has jurisdiction over plaintiffs' APA claims seeking to vacate agency action—here, defendants' unlawful use of regulatory authority to rescind previously granted extensions. Plaintiffs sought, and the court ordered, solely equitable relief: a preliminary injunction preventing defendants from rescinding the previously granted extensions and directing them to treat plaintiffs' reimbursement requests as timely so they may be reviewed accordingly. The Tucker Act does not apply because plaintiffs

2

do not seek monetary damages for breach of contract, nor did the court order payment of any kind.

Plaintiffs are also likely to succeed in showing that defendants' actions were arbitrary and capricious and contrary to law. For example, the Department's attempt to justify terminating plaintiffs' liquidation periods based on the pandemic's end is unreasonable and contrary to Congress's intent that funds remain available to address the pandemic's lingering effects, including loss of educational attainment. And defendants failed to consider plaintiffs' extensive reliance on the extended liquidation periods.

*Second*, the equitable factors weigh dispositively in plaintiffs' favor. As the district court found, absent injunctive relief, plaintiffs will suffer irreparable harm from needing to dismantle necessary educational programming, upend employment determinations, and stop infrastructure projects in their tracks, leaving sections of schools unusable. By contrast, defendants suffer no harm from accepting plaintiffs' reimbursement requests as timely.

## BACKGROUND

Congress provided pandemic relief through several major appropriations laws, including the American Rescue Plan Act of 2021 (ARP), Pub. L. No. 117-2, 135 Stat. 4.[2] ARP established and funded programs under which States could apply for grants to support the education of K–12 students. Congress provided that these "education-stabilization" funds be broadly used, inter alia, to restore in-person instruction; ensure continuity of services; respond to students' academic, social, and emotional needs; and address the lasting impact of learning losses. *See, e.g.*, ARP § 2001(e), 135 Stat. at 20-22. Department guidance confirmed the broad range of permitted uses for funding.[3]

Plaintiffs applied for and collectively received billions of dollars in education-stabilization grants. As part of that initial grant-approval process, plaintiffs submitted to the Department plans for the use of their

---

[2] In addition to ARP funding to all plaintiffs, the agency action at issue also implicates certain grants to Maryland, Michigan, and Pennsylvania under the Coronavirus Response and Relief Supplemental Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1909 (2020).

[3] U.S. Dep't of Educ., *Frequently Asked Questions: Elementary and Secondary School Emergency Relief Programs* 14 (Dec. 7, 2022 update). (For sources available online, URLs appear in the Table of Authorities. All websites last visited on June 12, 2025.)

4

funds, created systems for reviewing and approving funding requests from local education agencies and nonpublic schools in plaintiffs' jurisdictions, and directed the Department to public websites with detailed information about local projects.[4]

Congress provided that education-stabilization funds "remain available" through specified dates and did not tie the funds' availability to the pandemic's end. *E.g.*, ARP § 2001(a), 135 Stat. at 19. Under ARP, awarded funds are available for obligations incurred under contracts entered into through September 2024. *See id.*; 20 U.S.C. § 1225(b). And under applicable regulations, grant recipients initially had until January 2025 to liquidate funds. *See* 2 C.F.R. § 200.344(c). Accordingly, the statute set an initial deadline for States to enter into eligible contracts, and States then continued during the liquidation period to seek reimbursement for expenses under those contracts as the work continued.

---

[4] *See, e.g.*, Letter from Miguel A. Cardona, U.S. Sec'y of Educ., to Betty Rosa, N.Y. State Comm'r of Educ. 1 (Aug. 5, 2021); N.Y. State Educ. Dep't, *American Rescue Plan (ARP): Elementary and Secondary School Emergency Relief (ESSER) State Plan* (June 7, 2021). (*See also* Hr'g Tr. 26 (May 6, 2025) ("May 6 Tr."), ECF No. 84-2.)

After the expiration of the COVID-19 disaster declaration in May 2023,[5] Congress urged the Department to grant States extensions of the liquidation periods, S. Rep. No. 118-84, at 253 (2023), and the Department then solicited extension requests.[6] Plaintiffs each submitted detailed extension requests listing the amount of their eligible unliquidated funds, the specific schools and subcontractors who would receive those funds, and the reasons for the extensions. Exercising its regulatory authority to grant extensions when justified, 2 C.F.R. § 200.344(c), the Department determined that plaintiffs each had provided sufficient justification and documentation and approved extensions of the liquidation periods through, with limited exceptions, March 2026. Relying on these extension approvals, plaintiffs created budgets, hired staff, began to upgrade school facilities, and implemented student programming. (See Pls.' Mem. of Law 3-4 & nn.3-6 (May 14, 2025) ("Second PI Mot."), ECF No. 85 (citing plaintiffs' declarations).)

---

[5] *See* FEMA, Major Disaster Declarations and Related Determinations: Expiration of COVID–19-Related Measures, 88 Fed. Reg. 8884, 8884 (Feb. 10, 2023).

[6] Letter from Adam Schott, U.S. Dep't of Educ., to Grantees (Jan. 9, 2024).

But on March 28, 2025, defendants issued a letter abruptly and categorically rescinding the previously granted extensions and terminating the liquidation periods as of that day. Although the extensions had been sought and approved after the pandemic had ended, the letter asserted that "[e]xtending deadlines for COVID-related grants . . . years after the COVID pandemic ended is not consistent with the Department's priorities and thus not a worthwhile exercise of its discretion." (Letter from Linda McMahon, U.S. Sec'y of Educ., to State Chiefs of Educ. (Mar. 28, 2025) ("March 28 Letter"), ECF No. 1-1.) The Department purported to institute an entirely new process, under which States could again apply for extensions of their liquidation periods but only on a project-specific basis. The Department would review whether each project was sufficiently connected to COVID-19 mitigation and aligned with the Department's new priorities. (*See id.*)

Following the March 28 letter, state education agencies were blocked from submitting timely reimbursement requests for costs associated with managing and distributing funds to local education agencies. As a result, some state education agencies were forced to lay off or furlough staff, or expected to do so imminently. And state and local education

7

agencies were forced or expected to terminate contracts with vendors and other partners—including for capital improvements to school facilities that had already begun. Likewise, programs designed to compensate for lost instruction time during the pandemic—such as summer school and extended day programs—were halted or in danger of being discontinued. (See Pls.' Mem. of Law 11-12 & nn.11-16 (Apr. 11, 2025), ECF No. 11 (citing plaintiffs' declarations).)

On April 10, plaintiffs brought this suit challenging defendants' March 28 termination of their liquidation periods as arbitrary and capricious and contrary to law under the APA. (Compl. ¶¶ 192-215 (Apr. 10, 2025), ECF No. 1.) The next day, plaintiffs moved for a preliminary injunction to enjoin enforcement of the March 28 letter. (Notice of Mot. (Apr. 11, 2025), ECF No. 10.)

On May 6, the district court granted the preliminary injunction. (Prelim. Inj. Order (May 6, 2025) ("May 6 Order"), ECF No. 77.) The court determined that the March 28 letter constituted final agency action. (May 6 Tr. 44.) The court also held that defendants likely violated the APA because the proffered explanation for their change in position—the pandemic's end—was unreasonable and contrary to Congress's intent

8

that education-stabilization funds remain available after the pandemic's end to address children's loss of educational attainment and other continuing difficulties. (*See id.* at 44-45.)

The court found that, absent preliminary relief, plaintiffs and the public would suffer irreparable harm from education-program terminations, staff layoffs, and work stoppage on infrastructure projects that would render parts of schools unusable. By contrast, defendants would not be irreparably harmed by the preliminary injunction because the funds were congressionally appropriated for particular uses and already subject to an extensive vetting process. (*See id.* at 45-46.) Defendants did not appeal.

Five days later, on May 11, the Department issued a second letter that again terminated plaintiffs' liquidation periods, this time as of May 25, 2025. (Letter from Hayley B. Sanon, U.S. Dep't of Educ. (May 11, 2025) ("May 11 Letter"), ECF No. 84-1.) The May 11 letter again relied on the pandemic's end and asserted that the previously approved projects were insufficiently tied to the governing statutes' goals and that the funds would be better used for deficit reduction. The letter also cited the increased pace of plaintiffs' reimbursement requests following the May 6

9

preliminary injunction, which had allowed plaintiffs to resume submitting timely reimbursement requests, as a reason to require plaintiffs to apply anew for project-by-project extensions. (*See id.* at 3.)

Plaintiffs moved for a temporary restraining order and a preliminary injunction against enforcement of the May 11 letter, which the district court granted on May 20 and June 3, respectively. (Order to Show Cause 2 (May 20, 2025), ECF No. 95; Prelim. Inj. Order (June 3, 2025) ("June 3 Order"), ECF No. 106.) The court adhered to its earlier findings that plaintiffs had established a strong likelihood of success on the merits and irreparable harm, and that the balance of equities and public interest tipped decidedly in their favor. (Hr'g Tr. 23-32 (June 3, 2025) ("June 3 Tr."), 2d Cir. ECF No. 17, Ex. 1.) The court rejected defendants' argument (raised for the first time) that the Tucker Act divested the court of jurisdiction, explaining that plaintiffs do not seek to enforce contract terms or assert claims for money damages but rather seek equitable relief to enforce statutory rights. (*Id.* at 13.)

The June 3 order does not require defendants to make any payments but rather preliminarily enjoins defendants from enforcing the May 11 or March 28 rescission letters that terminated the liquidation

10

periods. (June 3 Order 1-2.) Although the Department may not summarily reject plaintiffs' reimbursement requests as untimely, the Department is entitled to ensure that the funds are being used for previously approved projects before granting any reimbursement request and the court imposed no specific time limit on that inquiry. (June 3 Tr. 28.) The court included a provision requiring that defendants "process" the requests "without delay" (June 3 Order 2), to ensure that defendants promptly conducted the pre-March 28 review process (*see* June 3 Tr. 12-13, 30). The court agreed this language was necessary to "make sure that these [requests] are being processed" (*see id.* at 30), considering that some reimbursement requests dating to March 28 were still pending as of June 3 (*see id.* at 25-26).

Defendants appealed from the June 3 order and moved for a stay pending appeal and an immediate administrative stay. On June 10, Judge Nathan denied an administrative stay and referred the motion to a motions panel. Order (June 10, 2025), 2d Cir. ECF No. 24.

11

# ARGUMENT

## THIS COURT SHOULD DENY A STAY PENDING APPEAL

The Court considers four factors in issuing a stay pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interesting in the proceeding; and (4) where the public interest lies." *In re World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007) (quotation marks and footnote omitted). Defendants satisfy none of these factors.

## A.    Plaintiffs, Not Defendants, Are Exceedingly Likely to Succeed on the Merits.

### 1.    The district court has jurisdiction.

The district court correctly concluded that it has jurisdiction over plaintiffs' claims under the APA. The APA authorizes federal district courts to hear suits from persons "adversely affected or aggrieved by agency action" who seek "relief other than money damages." 5 U.S.C. § 702. By contrast, the Tucker Act—which defendants incorrectly invoke (Mot. 16-20)—grants the Court of Federal Claims jurisdiction over suits based on "any express or implied contract with the United States." 28

12

U.S.C. § 1491(a)(1). "The Tucker Act yields," however, "when the Administrative Procedure Act provides an avenue for relief." *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 323-24 (2020) (citation omitted).

The APA squarely applies to this case. Plaintiffs challenge defendants' unlawful agency action—i.e., their rescission of the prior regulatory approval of the liquidation-period extensions—as arbitrary and capricious and contrary to law. (Compl. ¶¶ 192-215.) And plaintiffs seek purely equitable relief to vacate the unlawful rescission, declare the rescission unlawful, and enjoin its enforcement. (*Id.* at 51.) *See Polanco v. U.S. Drug Enf't Admin.*, 158 F.3d 647, 652 (2d Cir. 1998) (APA applies to suits seeking "only equitable relief"); *Aetna Cas. & Sur. Co. v. United States*, 71 F.3d 475, 479 (2d Cir. 1995) (district courts have jurisdiction over suits seeking "injunctive relief to force the government to perform a legal obligation"). Plaintiffs' claims are not based on any contract and do not seek monetary damages, and the Tucker Act is therefore inapplicable.[7]

---

[7] Defendants evidently reached the same conclusion when they failed to challenge the district court's jurisdiction in opposing plaintiffs' first motion for a preliminary injunction, despite plaintiffs' addressing the Tucker Act in their motion. (*See* June 3 Tr. 3.)

13

*See Linea Area Nacional de Chile S.A. v. Meissner*, 65 F.3d 1034, 1042-43 (2d Cir. 1995).

In *Bowen v. Massachusetts*, 487 U.S. 879 (1988), the Supreme Court applied the APA rather than the Tucker Act in circumstances analogous to those presented here. In *Bowen*, Massachusetts sued the U.S. Secretary of Health and Human Services to challenge his refusal to reimburse the State for certain categories of Medicaid expenses. 487 U.S. at 882. The Court explained that the APA applied because Massachusetts sought declaratory and injunctive relief to enforce a statutory mandate, *id.* at 900, and to "undo the Secretary's refusal to reimburse the State"—not monetary damages to compensate for past injury, *id.* at 910. Any resulting future payments were the proper consequence of the court having fulfilled its "primary function of reviewing the Secretary's interpretation of federal law" and concluding that it was incorrect. *Id.*

*Bowen* is directly on point here. Plaintiffs seek specific equitable relief against the Department's unlawful action in rescinding the liquidation-period extensions—just as Massachusetts sought specific equitable relief against the Secretary's unlawful action in denying reimbursements. *See id.* at 911. And just as in *Bowen*, plaintiffs' claims

14

for purely equitable relief are not transformed into claims for money damages merely because vacating and enjoining the Department's unlawful rescission might result in the Department ultimately paying reimbursements. *See id.* at 893-94, 910.

The preliminary injunction merely stops the Department from summarily rejecting plaintiffs' reimbursement requests as untimely. This prospective injunctive relief concerning the agency's ongoing obligations is squarely within the district court's power to award. *See Polanco*, 158 F.3d at 652 (district court had jurisdiction to vacate "wrongful agency action" that created procedural bar to recovering property). Payments that result from the Department's consideration of plaintiffs' timely reimbursement requests are simply a byproduct of the awarded equitable relief. *See Bowen*, 487 U.S. at 893-94.

Moreover, as the Court explained in *Bowen*, the Court of Federal Claims "does not have the general equitable powers of a district court to grant prospective relief." *Id.* at 905. Cases like this one, which seek "prospective declaratory and injunctive relief to clarify the extent of the Government's ongoing obligations," *Maine Cmty. Health Options*, 590 U.S. at 326, do not belong in the Court of Federal Claims. They belong

15

instead in district court because otherwise plaintiffs would lack any adequate remedy. *See id.* at 327.

Defendants wrongly argue that plaintiffs allege a breach of contract. *See* Mot. 17-20. Plaintiffs nowhere allege that defendants violated any contractual term.[8] The claims asserted in the complaint, and the district court's award of preliminary relief, instead arise from the Department's exercise of regulatory authority. When the Department initially granted plaintiffs' extension requests, it acted under its regulatory authority to approve such requests when justified. *See* 2 C.F.R. § 200.344(c). The Department then rescinded those extensions, and plaintiffs challenge that change in regulatory position as unlawful. Plaintiffs' claims thus do not sound in contract but rather "seek to enforce compliance with statutes and regulations." *See Community Legal Servs. in E. Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, No. 25-2808, 2025 WL 1393876, at *2 (9th Cir. May 14, 2025).

---

[8] Defendants' breach-of-contract cases are inapposite. *See Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1362-63 (Fed. Cir. 2021); *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1350-55 (Fed. Cir. 2021); *San Juan City Coll. v. United States*, 391 F.3d 1357, 1359 (Fed. Cir. 2004).

Nor is it true that plaintiffs "are really seeking . . . payment." *Contra* Mot. 19. Consistent with the complaint's requested relief, the preliminary injunction does not require the Department to make any payments but rather enjoins the Department from enforcing the rescission letters to terminate plaintiffs' liquidation periods and summarily reject plaintiffs' reimbursement requests as untimely.[9] (*See* June 3 Order 1-2.) Under the injunction's terms, defendants may ensure that the funds are being used for previously approved projects before granting a reimbursement, and the court imposed no specific time limit on that inquiry. (*See* June 3 Tr. 28.) The district court's directive that the Department "process" plaintiffs' reimbursement requests "without delay" (June 3 Order 2) merely ensures that plaintiffs do not evade the order's terms by stalling this review process—which does not include revisiting either the prior approvals of plaintiffs' extension requests or the prior approvals of plaintiffs' project plans (*see* June 3 Tr. 28, 30).

---

[9] This case is therefore unlike *Sustainability Institute v. Trump*, where the court ordered the government to "restore Plaintiffs['] access to grant funds immediately." *See* No. 25-1575, 2025 WL 1587100, at *1 (4th Cir. June 5, 2025) (quotation marks omitted).

17

For these reasons, defendants misplace their reliance (Mot. 17-18, 20) on *Department of Education v. California*, 145 S. Ct. 966 (2025). There, the Court appeared to conclude that the preliminary relief "enforce[d] a contractual obligation to pay money," *id*. at 968 (quotation marks omitted). Here, as explained, the preliminary injunction enjoins regulatory action rather than enforcing a contract obligation or ordering payment of money. In any event, *California* is a nonprecedential stay order, and it recognized *Bowen* as controlling law. *See id*.

### 2. The May 11 rescission letter constitutes final agency action.

Contrary to defendants' contention (Mot. 21-22), the May 11 rescission letter is final agency action reviewable under the APA. *See* 5 U.S.C. § 704. The May 11 letter marks the consummation of the Department's decisionmaking process, *see Bennett v. Spear*, 520 U.S. 154, 177-78 (1997), because it definitively rescinded the prior approvals of plaintiffs' liquidation-period extensions and terminated the liquidation periods as of May 25, 2025. And the letter had immediate legal consequences, *see id.*, because plaintiffs could no longer submit timely reimbursement

18

requests and instead were directed "to wind down their existing obligations for work already completed" (May 11 Letter 1).

The Department's implementation of an entirely new, project-specific extension-application process is irrelevant. The agency action at issue is the Department's final decision to terminate the existing extensions and institute a new (and arduous) legal regime—not the Department's speculative future decisions under that new regime. *See Bennett*, 520 U.S. at 178 (legal consequences flow where agency alters applicable legal regime); *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 592 U.S. 261, 268 (2021) ("What matters . . . is not whether a document is last in line, but whether it communicates a policy on which the agency has settled.").

### 3. Defendants' rescission of the previously approved extensions was arbitrary and capricious.

Defendants concede that the May 11 rescission letter represented a change in position from the Department's prior approval of plaintiffs' extension requests. Mot. 23. Accordingly, under the change-in-position doctrine, defendants were required to "provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *FDA v. Wages & White Lion Invs.*,

*L.L.C.*, 145 S. Ct. 898, 917 (2025) (quotation and alteration marks omitted). The May 11 letter does not satisfy this standard.

### a.  Defendants failed to provide a reasoned explanation for their change in position.

Defendants failed to provide any "reasoned explanation" for rescinding the previously approved extensions. *See id.*

First, the May 11 letter again contended that the pandemic had ended, and that funds would be better used for deficit reduction. (May 11 Letter 3.) In this Court, defendants do not raise, and thus forfeited, this end-of-the-pandemic justification. And for good reason: Congress did not tie education-stabilization funding to the pandemic's pendency but rather to specific dates. *See, e.g.*, ARP § 2001(a), 135 Stat. at 19. Congress also directed that the funds be used to address the pandemic's *long-term* effects on students and schools. *See, e.g.*, ARP § 2001(e), 135 Stat. at 20-22. Indeed, the pandemic emergency had already formally ended when Congress urged the Department to grant liquidation-period extensions, *see* S. Rep. No. 118-84, at 253, and when the Department did so. The agency may not second-guess Congress's specified uses for the funds based on its own policy views that funds should be used for other

20

purposes. *See City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (agency's power is "authoritatively prescribed by Congress").

Second, defendants also fail to raise here, and thus abandoned, the May 11 letter's baseless contention that a student educational progress assessment purportedly showed that the funds "have not been put to their highest and best use." (*See* May 11 Letter 3.) As plaintiffs explained below (Second PI Mot. 11-12), the assessment was conducted months before many of the projects at issue had begun and thus does not reflect on the efficacy of those projects. And deficiencies in student performance further underscore the need for continued access to funding to help ameliorate them.

Third, the remaining justifications in the May 11 letter are also arbitrary and capricious. The letter contends that funded projects are "less connected to direct academic services to students and the ongoing educational harms caused by COVID." (May 11 Letter 2.) But defendants do not dispute (*see* Mot. 24) that the governing statutes authorize plaintiffs' projects, including those identified as objectionable in the May 11 letter. And defendants already approved plaintiffs' planned uses at the initial grant-application stage. See *supra* at 4-5. The regulation authorizing the

21

Department to approve extensions allows the agency to consider whether the applicant showed that additional time is needed to implement the project—not revisit whether the applicant should have entered into the approved obligation in the first place. *See* 2 C.F.R. § 200.344(c).

There is no basis for the letter's contention that "serious questions" had arisen about the Department's own initial extension review process. (May 11 Letter 3). Defendants' counsel represented below that he had "no reason to believe," based on the record, that the initial process did not involve a "careful review." (May 6 Tr. 27; *see* June 3 Tr. 19.) Contrary to the letter's assertion that the original approvals "included no explanation for the extensions" (May 11 Letter 3), those approvals explained that the requests "provide[d] sufficient justification and documentation for an extension to the period of liquidation" (*e.g.*, Letter from Laura Jimenez, U.S. Dep't of Educ., to Kathy Hochul, N.Y. Governor (Jan. 13, 2025), ECF No. 26-1.) The May 11 letter, by contrast, fails to consider the extensive narratives that plaintiffs submitted supporting their extension requests. (*E.g.*, Liquidation Extension Request (Dec. 5, 2024), ECF No. 26-4.) And the length of the extensions and the range of projects to which they apply

22

were consistent with Congress's desire for flexibility and the Department's own guidance. See *supra* at 4-6.

Nor is there any merit to the letter's purported concern that the pace of reimbursement requests increased following the court's initial May 6 preliminary injunction. (May 11 Letter 3.) If true, that is because the March 28 rescission letter prevented plaintiffs from submitting timely reimbursement requests and thus created a backlog. This consequence of defendants' unlawful March 28 rescission letter cannot and does not provide a rational basis to issue the May 11 rescission letter.

### b. Defendants failed to consider plaintiffs' reliance interests.

Defendants also failed to consider plaintiffs' substantial reliance interests in the already approved extensions. Plaintiffs submitted numerous declarations attesting that state education agencies, local school districts, and nonpublic schools created budgets, hired staff, offered services, commenced infrastructure projects, and developed operating plans in reliance on the extension approvals. See *supra* at 6. Defendants' response is that the May 11 letter provided a fourteen-day window in which to submit reimbursement requests before the liquidation periods

23

categorically terminated. Mot. 24-25. But this fourteen-day window was required by the first preliminary injunction to allow plaintiffs to seek further relief from the court if defendants again unlawfully rescinded the extensions. (*See* May 6 Order 2.) It reflects no meaningful consideration by defendants of plaintiffs' reliance interests and ignores the profound disruptions caused by the termination of the liquidation periods—which would otherwise end in March 2026—including disruptions to long-term contracts.

### 4. Defendants' rescission of the previously approved extensions was contrary to law.

Defendants' termination of plaintiffs' liquidation periods based on the pandemic's end and other invalid factors was also contrary to law. Congress tied the funds' availability to specific dates rather than the pandemic's duration. Moreover, where Congress intended to limit pandemic-relief programs to the pandemic's end, it said so expressly. *Cf.* ARP §§ 9402, 9811(b)(3), 135 Stat. at 127, 211. And after the federal government declared an end to the pandemic, Congress rescinded certain COVID-related appropriations without disturbing the appropriations here. *Cf.* Fiscal Responsibility Act of 2023, div. B, tit. I, Pub. L. No. 118-

5, 137 Stat. 10, 23-30. This statutory context, together with Congress's encouraging the Department to grant extensions *after* the pandemic's declared end, establish that defendants' central reasoning in terminating plaintiffs' liquidation periods runs contrary to law.

**B.    The Balance of Equities Weighs Dispositively in Plaintiffs' Favor.**

The district court correctly found that, without preliminary relief, plaintiffs will immediately suffer devastating harm from stopping educational programs already in place, halting infrastructure projects in their tracks and thus leaving sections of schools unusable, and forcing widespread staff terminations. (*See* June 3 Tr. 23-24; May 6 Tr. 45.) Defendants do not meaningfully contest these findings, which are supported by abundant record evidence. See *supra* at 7-8. For example, Maryland was forced to wind down tutoring programs for Baltimore City public schools and after-school programming at forty sites. (Decl. of Carey M. Wright ¶ 11 (Apr. 8, 2025), ECF No. 21.) And one independent school in New York serving students with disabilities had to stop critical infrastructure work on its gymnasium, leaving large holes in the walls. (Decl. of Christina Coughlin ("Coughlin Decl.") ¶ 48 (Apr. 11, 2025), ECF No. 26.) Avoiding

25

such harms to students and schools is also in the public interest, whereas there is "no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016).

In arguing that plaintiffs will suffer no harm from a stay (Mot. 27), defendants ignore the extensive evidence demonstrating that the rescission had *already* begun inflicting irreparable harms on plaintiffs and the public before entry of preliminary relief. Moreover, plaintiffs cannot wait until they prevail on this appeal to access their education-stabilization funds (*contra* Mot. 27-28), because portions of schools will remain unusable in the meantime and valuable instruction time will be lost. And there is no guarantee that personnel will be willing or able to pick up where they left off when the projects resume. (*E.g.*, Coughlin Decl. ¶ 57.)

The Department's new project-specific extension-request process does not ameliorate these harms. Defendants have made clear that even projects authorized under the governing statutes and previously approved state plans may not survive its new approval process. *See* Mot. 24. For example, after Arizona attempted to submit a reimbursement request through the new process, the vast majority of the request was denied for

patently invalid reasons, including that the relevant projects "provid[ed] resources to teachers rather than directly supporting students" and "focused on health rather than academics." (Letter from Hayley B. Sanon, U.S. Dep't of Educ., to Tom Horne, Ariz. Dep't of Educ. 2-3 (May 2, 2025), ECF No. 78-1.) Meanwhile, ARP broadly appropriates funds "to address learning loss" and to support students' "academic, social, and emotional needs." ARP § 2001(e)(1), 135 Stat. at 20.

Defendants, by contrast, do not come close to establishing that they will suffer irreparable harm absent a stay. Even if processing plaintiffs' timely reimbursement requests under the pre-March 28 process results in the payment of funds, defendants are not irreparably harmed by "dispersing congressionally appropriated funds for statutorily mandated purposes." *Community Legal Servs. in E. Palo Alto*, 2025 WL 1393876, at *6. Here, Congress appropriated the education-stabilization funds to address the pandemic's lingering effects on students and schools, and the Department is not permitted to use the funds for other purposes. Moreover, defendants chose not to appeal the district court's May 6 order—under which they continue to operate. *See* Mot. 10, 27.

27

Defendants have also failed to provide any record evidence to support their assertion that they will be unable to recover grant funds once dispersed. *See* Mot. 26-27 (citing *California*, 145 S. Ct. at 969). That contention is inconsistent with both defendants' request for only a nominal bond of $10,000 (June 3 Tr. 31), and defendants' declaration below referencing the Department's tools for recovering funds (Decl. of Ruth E. Ryder ¶ 7 (May 29, 2025), ECF No. 101).

## CONCLUSION

The motion for a stay pending appeal should be denied.

Dated:  New York, New York
         June 12, 2025

                             Respectfully submitted,

                             LETITIA JAMES
                              *Attorney General*
                              *State of New York*
                           Attorney for Plaintiffs-Appellees


By:   */s/ Stephen J. Yanni*
          STEPHEN J. YANNI
          Assistant Solicitor General

BARBARA D. UNDERWOOD          28 Liberty Street
  *Solicitor General*                 New York, NY 10005
JUDITH N. VALE                   (212) 416-6184
  *Deputy Solicitor General*
STEPHEN J. YANNI
  *Assistant Solicitor General*
    *of Counsel*

(*Counsel listing continues on following pages.*)

29

KRISTIN K. MAYES
  *Attorney General*
  *State of Arizona*
2005 North Central Avenue
Phoenix, AZ 85004

ROB BONTA
  *Attorney General*
  *State of California*
1300 I Street, Suite 125
Sacramento, CA 95814

KATHLEEN JENNINGS
  *Attorney General*
  *State of Delaware*
820 N. French Street
Wilmington, DE 19801

ANNE E. LOPEZ
  *Attorney General*
  *State of Hawaiʻi*
425 Queen Street
Honolulu, HI 96813

KWAME RAOUL
  *Attorney General*
  *State of Illinois*
115 S. LaSalle Street
Chicago, IL 60601

AARON M. FREY
  *Attorney General*
  *State of Maine*
6 State House Station
Augusta, ME 04333

ANTHONY G. BROWN
  *Attorney General*
  *State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

ANDREA JOY CAMPBELL
  *Attorney General*
  *Commonwealth of Massachusetts*
1 Ashburton Place, 20th Floor
Boston, MA 02108

DANA NESSEL
  *Attorney General*
  *State of Michigan*
525 W. Ottawa Street
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
  *Attorney General*
  *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Boulevard
St. Paul, MN 55155

AARON D. FORD
  *Attorney General*
  *State of Nevada*
100 N. Carson Street
Carson City, NV 89701

MATTHEW J. PLATKIN
  *Attorney General*
  *State of New Jersey*
25 Market Street
Trenton, NJ 08625

30

RAÚL TORREZ
  *Attorney General*
  *State of New Mexico*
408 Galisteo Street
Santa Fe, NM 87504

DAN RAYFIELD
  *Attorney General*
  *State of Oregon*
100 SW Market Street
Portland, OR 97201

BRIAN L. SCHWALB
  *Attorney General*
  *District of Columbia*
400 Sixth Street, NW
Washington, DC 20001

GOVERNOR'S OFFICE OF
GENERAL COUNSEL
Thomas P. Howell
  *Deputy General Counsel*
30 N. 3rd Street, Suite 200
Harrisburg, PA 17101
*Counsel for Governor Josh Shapiro,*
  *Commonwealth of Pennsylvania*

31

## CERTIFICATE OF COMPLIANCE

Pursuant to Rules 27 and 32 of the Federal Rules of Appellate Procedure, Ava Mortier, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this document, the document contains 5,196 words and complies with the typeface requirements and length limits of Rules 27(d) and 32(a)(5)-(6).

*/s/ Ava Mortier*